# Wheeling.

## McGinnis v. Curry et al.

### Decided April 27, 1878.

1. A wife sells her farm in Pennsylvania, which was her sole and separate property, and receives the purchase money and hands a portion of it to her husband. He invests it in a farm in Missouri, with the consent and approbation of his wife, and with her approval takes the deed to himself. The family reside upon the farm two years. He then, with her knowledge, exchanges this farm for a farm in West Virginia; and the deed for it is made to him. He afterwards sells a portion of this farm; and he and his family continue to reside on the residue of this West Virginia farm eighteen months. During all this time his wife set up no claim to either the Missouri farm or West Virginia farm, or to the money invested in them. He then becoming involved, conveys to his son all of this West Virginia farm, not previously sold, for the sole and separate use of his wife, the conditions named in it being love and affection to his wife, and $2,500.00 in cash paid by her (no money being then really paid by her). And about the same time he disposed of all his personal property to his sons. HELD:

I. The wife had a right to make a gift to her husband of the whole, or any part. of the purchase money of the Pennsylvania farm.

II. Such gift will under these circumstances be presumed to have been made.

III. There was no resulting trust to her, either of the farm in Missouri, or the farm in West Virginia.

IV. The conveyance by the grantor to his son, for the sole and separate use of his wife, was fraudulent and void, as to the creditors of the husband and grantor.

1878.
Special Term.

McGinnis
v.
Curry.

2. An attorney at law, as such, has no authority before or after the institution of a suit to make an agreement in *pais*, to submit his clients cause to arbitrators, though he may, if his clients are adults, consent in open court to submit their cause to arbitration; and, if they be adults, they will be thereby bound.

3. A cause, pending in the Supreme Court of Appeals, may under our statutes be submitted by a consent order to arbitration; and the judgment of the arbitrators may be entered up as the decree of the court; or the parties to the suit may by an agreement in *pais* submit a cause. pending in the Supreme Court of Appeals, to arbitration, and agree, that their award may be entered up as the decree of the court; and it may be accordingly so entered.

An appeal from and *supersedeas* to a decree of the circuit court of Ritchie county, rendered on the 26th day of April, 1876, in a cause, in said court then pending, in which John McGinnis was plaintiff and Jesse Curry and others were defendants, allowed upon the petition of the defendants below.

Hon. James Monroe Jackson, judge of the fifth judicial circuit, rendered the decree complained of.

Green, President, furnishes the following statement of the case:

In September, 1875, John McGinnis filed his bill, in the circuit court of Ritchie county, in which he alleged, that in 1873 there was a correspondence between Mc-Ginnis, who lived in said county, and Jesse Curry, who then lived in Missouri, which ultimately resulted in the exchange of their respective farms and personal property. After this agreement for this exchange had been made, Curry wrote him several letters requesting him to lend him, Curry, $250.00, saying that he, Curry, could not borrow it in Missouri for less than three years, and then only by giving a mortgage on his farm, which he did not want to do, and saying that if he borrowed the money for him, Curry, he could secure it by a

mortgage on the McGinnis farm, which Curry was to take. Three of these letters are filed with the bill. Two of these letters purport to be signed by Jesse Curry; and one of them by Philip Curry, his son, for his father, Jesse Curry. McGinnis borrowed the money, $250.00, of B. F. Moore. A note for it was drawn up and signed by Jesse Curry, and then signed by McGinnis, who got the money, and forwarded it to Jesse Curry at once. This was in the fall of 1873. In the spring of 1874 McGinnis moved to Missouri, to take charge of the farm, he had obtained by the exchange with Curry. He gave himself no thought about paying the note to Moore, being assured by Curry, that he would pay it, when it became due. In May, 1875, McGinnis learned, that Moore had instituted proceedings against Curry and him, to collect this debt, and had attached McGinnis's real estate, lying in Ritchie county, W. Va., Curry having conveyed away all his property including the farm he had got from McGinnis. He, McGinnis, then paid the debt, interest and costs to Moore. This was done by giving him his own note for $315.85, secured by a deed of trust; and Moore, receiving this as full satisfaction of the debt, gave him a receipt, filed with the bill, dated May 12, 1875.

The bill further says, that the plaintiff, McGinnis, is informed, that Jesse Curry told Moore, that he did not, and never did intend, to pay this note; that Curry refused to pay him, McGinnis, the amount of this note, saying he could not be made to pay it, as he had conveyed his property to his wife. The bill alleges, that Curry was seized and possessed of the farm, McGinnis had conveyed to him in the exchange, which consisted of three tracts, one of ninety-one acres, another of twenty acres, and the third of twenty acres, two roods and ten perches, lying in Ritchie county, W. Va. The deed therefor is filed with the bill. Its date is October 20, 1863. It was acknowledged in Ritchie county, W. Va.,

1878.
Special Term.

McGinnis
v.
Curry.

and recites, that all the parties resided in said county. On March 31, 1875, Jesse Curry conveyed to Richmond L. Curry, trustee, three parcels of land, excepting therefrom fifty and one-fourth acres, which he had previously sold B. F. Cottrill, in March, 1875, to be held by him, the said Richmond L. Curry, for the sold and separate use of Rebecca Curry, the wife of Jesse Curry, the grantor. The deed is filed with the bill and recites the consideration of the deed to be love and affection, the grantor has for his wife, and for the further consideration of $2,500.00 in hand paid by Rebecca Curry, the receipt whereof is acknowledged.

The bill charges, that this deed was voluntary; that the consideration, mentioned in the deed, was never paid; and that the deed was made with intent to defraud him, McGinnis.

The bill further alleges, that before making this deed Jesse Curry disposed of all his personal property, so that execution against him had been returned "no property found;" and, this being the case, McGinnis was compelled to pay off and discharge the note to Moore.

The bill makes the trustee, Richmond L. Curry, and Jesse Curry, and Rebecca, his wife, defendants, and asks, that they be required to answer the bill on oath; and it prays, that this deed to Richmond L. Curry, trustee, may be cancelled, set aside, and declared void; that he may have a decree for the amount paid by him to Moore; and this land may be sold to pay this debt; and for general relief. The bill was sworn to by the plaintiff.

The trustee, Richmond L. Curry, and Rebecca Curry filed a joint and several answer, sworn to by each of them. They admit the borrowing of the $250.00 of Moore, as stated in the bill, and also that some correspondence was had between Jesse Curry and McGinnis, both in relation to the borrowing of said money, and the trading of farms; and that by virtue of this corres-

pondence an exchange of farms was brought about; and they say, that at the time of the exchange it was the distinct understanding, that McGinnis was to make the deed for the farm in Ritchie County to Rebecca Curry. They deny, that the deed to Richmond L. Curry, trustee, was made with intent to defraud McGinnis, or that the consideration mentioned in said deed was never paid. They allege, that this consideration and $2,500.00 more was used by Jesse Curry at least five years before the making of the deed. They allege, that on May 23, 1866, Philip Axtell, the father of Rebecca Curry, executed to her a deed for one hundred and fourteen acres and fifty-one perches in Pennsylvania, where Jesse Curry and she then lived, which land was valued at $2,000.00. The deed for it is filed. The consideration named in it is $2,000.00. They allege, she then sold it to Zenas Johnson for $5,114.34; and a copy of the deed to him, dated September 14, 1871, reciting this consideration, is filed.

They further allege, that she took the purchase money, arising from the sale of this land, and invested it in a farm in Missouri, the one exchanged with McGinnis, the deed for which was by mistake made to her husband; and it was not corrected, because the wife of the vendor refused to execute a new deed to her, Rebecca Curry, unless she would buy for her a new dress worth $20.00, which she would not do. This deed is not filed; and the date of this transaction is not given; but in this answer she says, being determined to secure to herself as much of this money as she could, after the trade between her husband and McGinnis, " she made a demand of her husband and McGinnis, that the deed should be made to her of the Ritchie county land." But in this she was defrauded, being told by her counsel, that being a married woman she could not hold property separate and apart from her husband in this State. And the deed was thus made to her husband contrary to her express wish. And then by the advice of other counsel the deed was made

1878.
Special Term.

McGinnis
v.
Curry.

to Richmond L. Curry, as her trustee, for her sole and separate use. And they claim, that it was made for a *bona fide* consideration and without fraud.

Jesse Curry also filed his separate answer on oath. He admits the correspondence between him and McGinnis, which resulted in a trade of their farms. He admits writing him a letter asking him to loan him $250.00 for one year. But he denies, he ever consented or authorized McGinnis to give a lien on his farm in Ritchie county for this money, to be borrowed; and he calls for full proof of this. He denies, that he wrote the letters filed with the bill, or authorized them to be written; and calls for full and perfect proof of them. He admits the receipt of the $250.00 and the execution, jointly with McGinnis, of the note therefor to B. F. Moore; and that shortly after this he came to Ritchie county to live. And he says, McGinnis shortly afterwards went to Missouri to live.

He denies saying to him, "that he need not fear about said note being paid, when it became due." He did not say so, because he had fully liquidated the said note, before McGinnis moved away, in this manner. That it was understood and agreed between them, that not only should they exchange farms, but also their farming utensils, and household and kitchen furniture. That each of them was to have his respective personal property appraised; and the exchange was to be made on the basis of this appraisement. That he, Curry, had his fairly appraised; but McGinnis made the appraiser drunk, and had his fraudulently appraised, at at least $400.00 more than it was worth. He denies he ever said, he intended to put his property out of his hands to avoid the payment of this note; but he admits he did say, he did not intend to pay it, as McGinnis owed him not less than $400.00. He would have paid this debt, but for this fraud practiced on him. He denies, that he got this money with any fraudulent intent. He denies,

that he ever told McGinnis, he could not be made to pay this debt, by reason of his having conveyed his property to his wife. He reiterates the statement of his wife and her trustee in their answer relative to the understanding, that McGinnis was to make this deed to his wife, and all the allegations, about her interest in Pennsylvania, and transactions in Missouri, and assigned the same reasons, why the deed in Missouri and the McGinnis deed were made to him.

He asks, that his answer may be regarded as a cross bill; and that he may have a decree against McGinnis for the $400.00, of which he was defrauded; and for general relief.

In this answer he says, "he presumed, that said McGinnis had paid off and discharged the said note (meaning the note to Moore), as of right he ought to have done.

To this McGinnis files a special replication on oath; admits the understanding to exchange the personal property; denies, that the appraiser of his personal property was drunk, when he made it, and says, that he was sober and perfectly qualified to make the appraisement; and the appraisement was a just and fair appraisement. He files copies of the appraisement of both his and Curry's property. In the appraisement of Curry's property is also included certain personal property of Philip Curry, his son. His appraisement amounts to $1,287.10, and exceeded Curry's appraisement some $80.00.

He admits, that he sent his appraisement to Curry in Missouri, and shortly afterwards he came with his family to Ritchie county, and sometime afterwards, when he was about to give him possession and turn over the personal property, Curry objected to the price affixed to some of the articles; and he did not wish to take some of them. Not being able to agree about it, they submitted the matter to arbitrators, a copy of the submis-

sion is filed with this replication; and the arbitrators made an award, a copy of which is also filed.

The arbitrators found, that the understanding between the parties did not require, all of the personal property by either to be taken by the other; and they found, that Curry was not bound to take, and should not take, certain personal property of McGinnis's, valued at $54.00; and that he should take the balance, and pay the difference between the two appraisements, which after this reduction was $42.48, which sum the replication alleges McGinnis never paid.

McGinnis's deposition was taken. He proves substantially the statements in his bill and replication, relative to the trading of the farms, the appraisement of the personalty, the controversy about the personalty, the settlement of it by arbitration, and the refusal of Curry to comply with the award of the arbitrators; he files with his deposition the deed from Curry to him. It is dated Sept. 22, 1873. He says there was nothing said in the trade about his making a deed of his land to Curry's wife; he says the three letters from Curry, he filed with the bill, are all the letters he got from him about borrowing this $250.00, that this whole business of borrowing this money for him was done by correspondence; and the money sent to Curry; and that these are all the letters written on the subject, he thinks. Curry came in, before he left West Virginia; and he told him, he would pay this $250.00, before it became due; that he was going to Pennsylvania to get some money due him; and he would pay off the Moore note, before it became due.

Joseph Cole deposed, that he had sold and conveyed to Jessie Curry the farm in Missouri; and he files with his deposition the deed, dated Oct. 5, 1871; he did not understand then, or afterwards, that it was bought with money belonging to Mrs. Curry; was not asked to make the deed to her; never refused to make the deed to Mrs.

Curry, unless $20.00 was paid by her. Nothing was ever said about making the deed to her; he supposed the money, with which the farm was bought, was Jesse Curry's money.

B. F. Moore testified to his lending the $250.00 to McGinnis, who told him he was borrowing it for Jesse Curry. The signatures of both of them were to the note. In the summer after McGinnis went to Missouri, Curry asked me, if I could not give him longer time on the note, which I told him I could. After I sued on the note, he said McGinnis had cheated him in the personal property; and it would be right to throw it upon him. I sued on the note, because Curry had conveyed away his real and personal property. He got the money on the note from Thos. E. Davis, McGinnis's counsel; he testified, that "people say Philip Curry is the biggest liar in the settlement," he would not like to believe him on oath. Ocran Corban also testified to his bad character for veracity among his neighbors; and from this character states, he would not believe him on oath.

The defendants, to sustain their case, took the deposition of Jesse Curry and his wife and two sons, Philip A. Curry and Richmond L. Curry.. Mrs. Curry, though in her answer she stated, "that at the time of the exchange it was the distinct understanding, that she was to have the farm in Ritchie county deeded to her," and again, "after the trade she made a demand of her husband and John McGinnis, that the deed should be made to her," yet in her deposition in contradiction of her answer she says, "I don't believe there was anything said to me by John McGinnis, as to whom McGinnis was to make the deed for the Ritchie county land; but Mr. Curry, my husband, said, the deed was to be made to me." She says, that in making this trade her husband acted as her agent. In her testimony-in-chief she repeats substantially her statements in her answer, except that she does not say anything about the Missouri

farm being deeded to her husband instead of her by
mistake.    In reference to the consideration for the deed
to a trustee for her use she says: "The consideration
therein named is *bona fide,* that is the $2,500.00, which
money I got from my father in land deeded to me in
Pennsylvania, which was sold by me, and che proceeds
of said land was invested in land in Missouri, and the
land in Missouri was traded to John McGinnis for his
farm in Ritchie county, West Virginia, and John Mc-
Ginnis made the deed for this land to my husband, and
I required my husband to make a deed to me."

On her cross-examination she says, that her husband,
Jesse Curry, got the $2,500.00, named in the deed of
McGinnis to him, in February, 1874 or 1875, when
he went to Pennsylvania, after he came to Ritchie county.
It was got from the sale of the land her father gave
her in Pennsylvania.    In her answer however she had
stated, she sold her farm in Pennsylvania for $5,144.34,
"took the purchase money arising from the sale of the farm,
so deeded to her by her father, and invested it in a farm
(or the greater portion thereof) in the State of Missouri."
This was in 1871, as the deed for Missouri land shows.
And Jesse Curry in his answer states, " that his wife
sold her farm in Pennsylvania, and invested the pro-
ceeds in the farm in Missouri."

Mrs. Rebecca Curry in her deposition likewise says,
" I think Jesse Curry was not involved, at the time he
made the deed of March 31, 1875, to Richmond L.
Curry, trustee for her use; he was not in debt as she
knew of."

Jesse Curry deposed, that in making the trade with
McGinnis his son, Philip Curry, did most of the writing
of letters.    He denies, that he wrote or authorized to be
written the two letters purporting to be signed by
him, filed with the bill, and which are in reference to
the borrowing for him of the $250.00.    He thinks one
of them is in the hand writing of his son Philip; don't

know in whose hand writing the other is; positively de-
nies, that he signed with McGinnis the joint note, which purports to be signed by him and McGinnis, and to be executed to Moore for the $250.00; says he signed a note, which was payable to McGinnis for this $250.00. This is in direct contradiction of his answer, in which he says, "it is true John McGinnis and he, Jesse Curry, gave their joint note for the same," that is, for this $250.00. He states, that he did sign the agreement to arbitrate their differences, and that he did not comply with the award; and says, that John McGinnis took away the property, he, Curry, was to have taken under the award; and yet he says in another part of his deposition, he had $1,200.00 worth of the McGinnis personal property in his possession in September, 1874, more than six months afterwards. He denies telling McGinnis, that he would pay the note when due. He says, this note was settled before the arbitration, using this language: "My understanding was, that if I would take his property at the appraisement, it would settle his claim upon me for the money, he, McGinnis, had sent me to Missouri."

This statement is inconsistent with the subsequent agreement to arbitrate, which he admits. With reference to the consideration for the deed, he made to a trustee for the use of his wife, he says: "The deed to the McGinnis farm in Ritchie county was to be made to my wife by John McGinnis; that was the distinct understanding between me and McGinnis. It was my wife's money, that bought the farm, which was traded for the McGinnis farm; that was the reason, the deed was made to her." He does not pretend, that on his trip to Pennsylvania, shortly before he made this deed to a trustee for the use of his wife, he got $2,500.00 of his wife's money, the $2,500.00 named in the deed, as is stated by her in her deposition. On the contrary, though he speaks of going to Pennsylvania shortly before this deed was made in January, 1874, yet he says nothing about the

1878.
Special Term.
McGinnis
v.
Curry.

receiving of $2,500.00 of his wife's funds. He also contradicts his wife, when he says in his deposition, "before McGinnis made the deed, he was requested in my presence by my wife to make out the deed to her." And yet he says, "I don't know any reason, why the deed was not made to my wife."

After McGinnis had made the deed, he said, he would attend to his own business in his own way. It was after the deed was made, that an attorney informed him, that a woman could not hold real estate in this State except under a marriage contract.

In his deposition Jesse Curry further says, " the deed to Richmond L. Curry, trustee, was made by me to secure my wife in the payment of the money, which I had used to purchase the farm traded for this. She demanded it as a matter of right." He says, he used of her money besides the $2,500.00 invested in the McGinnis farm, about $2,740.00. He repeats the statement in his answer about a mistake having been made in the deed for the land in Missouri being made by Cole to him instead of his wife, and Mrs. Cole's refusal to correct it, unless $20.00 extra was paid her. He says, Cole promised to make the deed to his wife. He states, that he disposed of all his personal property to his sons, about the time he made the deed for the use of his wife. He further states, that before he made the deed for his wife's use, he bought cattle and butchered them, and used the farm, as he had done the other farms, and that the Missouri farm was in his name all the time he remained West.

The depositions of Philip A. Curry and Richmond L. Curry were as follows:

### Philip A. Curry's Deposition.

" I am acquainted with the parties to this suit. Jesse and Rebecca Curry, defendants, are my father and mother. They reside on the farm bought of John Mc-

Ginnis, the plaintiff, situated in Ritchie county, West Virginia. The farm was purchased from John Mc-Ginnis three years last September. September, 1873, it was purchased from McGinnis by my mother; she bought it from her own money, which she received from the estate of her father, Philip Axtell, late of this county, deceased. I am not positive, but I think, Philip Axtell died nine years ago last fall. He made us a will before his death. The farm in this county was given to mother by deed from her father. Mother sold this farm in 1871 to Zenas Johnson for over $5,100.00. Mother then removed to Henry county, Missouri, during the fall of 1871. She bought a farm in that county from Joseph Cole, for which she paid, I think, $3,200.00. She remained there until 1873, when she went to West Virginia. Before going to West Virginia mother traded the farm, which she had purchased from Joseph Cole in Missouri, to John McGinnis for the farm, she is now living on in Ritchie county, West Virginia. McGinnis agreed to made the deed to my mother.

"When mother sold her farm in Washington county, Pennsylvania, to Johnson, the deferred payments were secured by judgment notes drawn in favor of mother. These notes, as they fell due, were collected by Axtell Throcmorton; and the money sent by him to mother, in Missouri. It was with this money, that she purchased the farm from Cole. In the purchase from Cole mother paid $2,000.00 down; and it was the understanding, that the deed was to be made to her; but when the deed was offered, it was found to have been made to father. Father objected to take the deed and told Cole, that it was mother's money, which bought the land, and that the deed was to be made to her. Cole said, he was willing to make the deed to mother, and promised to do so. At each payment Cole still promised to change the deed to mother, but did not do so. After the last payment was made, some difficulty arose be-

6

tween father and Cole, as to the possession or occupancy of the house, and then Cole said, he would not go to the expense of changing the deed; it remained in father's name.

"I am positive, that it was mother's money, realized from the sale of her Pennsylvania farm, that purchased the farm in Missouri. Father never, in any way, exercised, or claimed, ownership in the land in Missouri; father never paid a dollar of his money towards the purchase of the farm; this farm mother traded to McGinnis for the one, she now occupies; I had seen this farm, while father and mother were living in Pennsylvania. McGinnis is my cousin by marraige; and I was visiting him, and went over the farm. I suggested to mother the trade with McGinnis; and she authorized father to effect a trade with him. I did all the corresponding between the parties, in father's name. Mother had never seen the West Virginia farm, before the trade was finished, but acted upon my representation.

"Before they left Missouri, mother and father executed a deed for the Missouri farm to McGinnis, and took it with them to West Virginia; when they got there, McGinnis had his deed made for the West Virginia land to father; when this deed was offered, both father and mother refused to take it, for the reason that it should have been made to mother, and not to father; McGinnis had come to exchange deeds at that time; but when he was told, that it was mother's farm, bought by her money, he took the deed away and promised to have one made to mother, and set a day when he would have the deed ready in mother's name to exchange.

On the day named to meet in Harrisville, to exchange deeds, father had gone to Pennsylvania on business, and I was instructed to meet McGinnis and make the exchange of deeds; when McGinnis tendered me the deed, I saw it was the same deed he tendered father, and I refused to accept it, for I knew the deed was to have been

made to mother, and that McGinnis had promised to do so. We had both consulted Charles Merrick, Esq., an attorney in Harrisville ; and he told me, that a married woman could not hold land in West Virginia. It was owing to this advice, that I took the deed ; I would not have taken the deed, had he not given that advice. Father did not pay a dollar of his money for this land.

"PHILIP A. CURRY."

*Richmond L. Curry's Deposition.*

" I am a son of Jesse and Rebecca Curry, defendants in this suit. They formerly lived in this county on a farm, that belonged to my mother, received by her from Philip Axtell, her father. This farm was sold in 1871 to Zenas Johnson. They then moved to Henry county, Missouri, where mother bought a farm from Joseph Cole. I know this farm was purchased with mother's money. This farm was exchanged with John McGinnis for a farm in Ritchie county, West Va., on which they are now residing ; was still in Missouri when the deed from McGinnis to father was made. I remained in Missouri, after father and mother left, until the following April. I then went to West Virginia ; that was the first I knew, that the deed had been made to father. About a week or so after I came to Virginia, McGinnis went to Missouri ; about a year after I came back to Virginia, father executed a deed to me, as trustee for my mother, for the farm traded for with McGinnis. The transfer or deed was not made for the object of defrauding any person, for the reason that the farm was purchased by mother's property, in which father had no interest, and McGinnis had promised to make the deed to her. McGinnis's family knew, that the farm in Washington county belonged to mother. In Washington county he lived on the farm which mother had received from her father. Father was not able, while living in Washington county, Penn., nor while in Missouri, nor in Virginia, to purchase a farm.

" RICHMOND L. CURRY."

Wm. H. Douglass testified, that he, as an arbitrator chosen by Curry, signed the award, before referred to, as a matter of compromise. It was his opinion, that Curry was not compellable to take any more of McGinnis's personal property, than would cover his, Curry's, list, or in fact any more than he wished, because McGinnis had disposed of some of his best property.

These being all the depositions taken, the cause was heard on April 20, 1877, on the bill and answers, general replications to them, Jesse Curry's cross bill, McGinnis's answer thereto, exhibits and depositions; and the court being of opinion, that the deed made to Richmond L. Curry, trustee for Rebecca Curry, was made in fraud of the rights of McGinnis, and was void as to his debt, adjudged, ordered and decreed, that it be set aside, cancelled and annulled, and held void and of no effect as to McGinnis's debt; and that John McGinnis recover of Jesse Curry $352.90, with interest thereon from April 20, 1877; and unless he paid the same in thirty days, a special commissioner, thereby appointed, should sell the land, in the bill mentioned, at a named place, on specified terms, after a specified notice, and report his proceedings to the court; but that before receiving any money under the decree he was required to give bond, as required by law, in the penalty of $700.00.

To this decree an appeal and *supersedeas* to this court was granted to all the defendants.

Subsequently on July 19, 1878, an agreement was entered into under seal, signed by the appellee, John McGinnis, and by R. S. Blair, attorney for Jesse Curry and others, whereby, after reciting this decree and appeal, and that the appeal was set for trial in this court on January 30, 1878, and that the appellants and appellees desire to submit the cause to arbitration, the same to be finally determined by the arbitrators, it was agreed to submit to named persons, as arbitrators, to determine, whether said decree should be approved, or reversed, and if reversed, said suit was to be dismissed with costs; and if

affirmed, the appellants were to pay John McGinnis the amount of said decree and costs. And it was further agreed, that the award of the arbitrators was to be certified to this court, and that said award should be entered up as the judgment of this court.

On the 23d day of January, 1878, the arbitrators awarded, that said decree be affirmed, and that the appellants do pay to the appellee $30.00 damages and his costs in this court and the costs of the arbitrators, amounting to $33.40, and that the cause be remanded to the circuit court of Ritchie county to be further proceeded with in accordance with the rules governing courts of equity.

This award was returned to this court. There were endorsed on it exceptions, to-wit : First, because the attorney for the appellants had no power to submit the cause to arbitration; secondly, because the conclusion reached by the arbitrators was erroneous; thirdly, because this court cannot enter up such award as its decree; and fourthly, because the appellants are entitled to the judgment of this court on account of the errors in the record.

On January 30th, 1878, the appellee by his counsel moved this court, to be permitted to file this agreement to arbitrate in the cause and said award ; and the appellants, by their counsel, waived the issuing or service of any rule against them on said award, and appeared and moved this court to set aside the award for said reasons endorsed thereon ; and the attorney for the appellee moved this court to enter up the award as the judgment of this court ; and it was agreed by the parties, by their counsel, that if this court should be of opinion to set aside said award, it should determine said cause, as if no award had been made ; and the cause being argued was submitted to this court for decision.

*C. C. Cole,* of counsel for appellants :

*First.* A case pending in this Court may be arbitrated

by agreement of the parties.     Code W. Va. (1868) ch. 108, p. 569.

*Second.* A deed made by a husband to a trustee for the benefit of his wife, without a valuable consideration passing at the time of the deed, is void in equity as to existing creditors.    Code W. Va., ch. 74, §2, p. 473; *Chamberlyne* v. *Temple*, 2 Rand. 384; *Hunter* v. *Hunter*, 10 W. Va. 321; 1 Bishop on Law of Married Women, §§64-5.

*Third.* Where a married woman allows her husband to purchase real estate with her money, and take the title in his own name, such property becomes liable for the husband's debts, afterwards contracted on the faith of that property; and the fact, that the purchase money of the real estate was originally hers, does not constitute a sufficient consideration to support a deed for such real estate from the husband to a trustee for her benefit, as to a creditor whose debt was contracted after the conveyance to the husband, and prior to the deed by him to the trustee for the benefit of the wife.    *Hinney* v. *Phillips*, 50 Penn. St. 382; 1 Minor's Inst., pp. 299, 301 and authorities there cited; *Yerby et ux.* v. *Lynch*, 8 Gratt. 473; *Hill* v. *Wynn*, 4 W. Va. 453; 1 Bishop on Law Married Woman, §§742-743; Bigelow on Estoppel, p. 448.

*R. S. Blair,* counsel for appellants, relied on the following authorities:

Bishop on Mar. & Div., §747, and cases cited in note 2; *Id.* §757; *Id.* §§758-9, note 4; 9 Ind. 347, 349; 28 Ala. 623, 629; 1 Johns. Ch. 450; Perry on Trusts pp. 100, 101 and cases cited in note 3 on page 101; Big. on Fraud p. 450 and cases cited; *Id.* 454; Bump. on Fraud. Con. p. 31; *Id.* 63; 2 Rand. 384; Code W. Va. p. 569, §1·; 10 W. Va. 206; 2 Bish. on Mar. & Div., §§119, 122, 800; 31 Green (N. J.) 406; 30 Iowa 334; 22 Ohio St. 333; 7 Leigh 589; 2 Lomax 203, and cases cited; 6 Gratt. 40; 7 Bush 394; 9 Wall. 753.

1878
Special Term.
McGinnis
v.
Curry.

*Thomas E. Davis*, counsel for appellee, referred to the following authorities :

1 Gratt. 108; 3 W. Va. 672.; 4 W. Va. 693; 9 W. Va. 154; 2 W. Va. 83; 4 W. Va. 4; 5 Cranch 351; 4 W. Va. 453; 1 Atk. 93; 2 Atk. 600; 1 Cranch 309; 3 Gratt. 26; 10 W. Va. 321.

GREEN, PRESIDENT, delivered the opinion of the Court :

Before considering the merits of this case we must dispose of the preliminary question, whether the award made in this case can be entered as the judgment of this Court. This will, as we shall presently show, depend upon the authority of the counsel of the appellants, as such, to consent to the submission by the agreement in *pais* entered into by him.

The authority of an attorney at common law, by a consent order made in the court, to submit a pending suit to arbitration, is universally admitted. And the court, in cases where such a consent order has been made at the instance of counsel, have frequently spoken of the authority of counsel to submit a controversy of his client to arbitration in general language, which would be broad enough to include, not only a case of a submission of a controversy in a pending suit by an agreement of counsel in *pais*, but even a controversy about which no suit was pending. But all the cases, in which such loose and general language was used, were cases, where the authority of the counsel was exercised, not only in a pending suit, but by a consent order agreeing to the submission made in open court. See *Wilson* v. *Young*, 9 Barb. 101; *Holker* v. *Parker*, 7 Cranch 449; *Somers* v. *Balabrega*, 1 Dallas 177; *Bingham's trustees* v. *Guthrie*, 19 Penn. St. 418.

In England, though, so far as I know, it has never

Syllabus 2.

1878
Special Term.
McGinnis
v.
Curry.

been decided, that an attorney had a right to submit his client's controversy to arbitration, when no suit was pending, or by an agreement in *pais*, and not by order in court, when a suit was pending, yet there are English cases, from which it may be inferred, that the courts may there consider the power of the attorney to submit his client's cause to arbitration in general, and not confined to pending suits, or to orders of reference made in court. See *Banfil* v. *Leigh & Jeffray*, 8 T. R. 571 ; *Jamison* v. *Binns & Dean*, 4 Ad. & E. 945 (21 Eng. C. L. 231). But in considering how much weight should be attached to these dicta of English judges, it should be remembered that an attorney in England occupies toward his client a very different relation from what he does in this country. There he is very frequently the general agent of the client, and transacts a great deal of his general business. But here an attorney is generally employed to attend to his client's interest in reference to some single controversy.

In Pennsylvania too there are decisions, which might seem to imply, that the power of an attorney, to submit to arbitration, was not confined to the making of a consent order in a pending cause to refer it to arbitration. See *Bingham's trustees* v. *Guthrie*, 19 Penn. St. p. 419. But in considering what weight should be attached to the dicta of Pennsylvania judges, it should also be borne in mind, that in Pennsylvania the authority of attorneys is more extensive than elsewhere. See *Lynch* v. *Commonwealth*, 16 Serg. & R. 388; *Wilson* v. *Young*, 9 Penn. St. 101.

While I have found no case *deciding* that an attorney has a general authority to submit his client's controversies to arbitration, there are cases, in which it has been decided, that he does not possess such general authority. See *Jenkins et al.* v. *Gillespie*, 10 Smedes & M 31 ; *Scarborough* v. *Reynolds*, 12 Ala. 252.

It is true, that these were cases in which there was no

*lis pendens.* But it seems to me, that as it is held, that an attorney by reason of his being employed to institute a suit or defend a threatened suit has no authority to submit, by an agreement in *pais* signed by the attorney, the case to arbitration, that it must follow, that he has no such authority, though the suit be pending. An authority to act in *pais* could only be inferred, if it exist, from his employment before the institution of the suit as an attorney ; and such employment we have seen confers no such authority.

1878
Special Term.

McGinnis
v.
Curry.

This conclusion is not at all inconsistent with the numerous causes deciding, that an attorney has authority in a pending suit by an order of court to submit the cause to arbitration. When the courts have assigned any reason for their decisions, they have been based not merely, if at all, on the employment of the counsel by the client, but on the fact, that he is an officer of the court acting in the presence and under the control of the court, and as such has a right to take any legal steps, he may deem proper, in prosecuting or defending the suit. Thus at the trial of the case he may admit facts, and his client is bound by such admission ; he may confess a judgment in court, which will bind the client ; he may demur to the evidence, and thus prevent a jury from acting on the case ; and he may do many other acts in court, by which his client may be prejudiced, but by which he is nevertheless bound ; and why, it is asked, may he not in court consent to an order submitting the case to arbitrators, this being one of the legal modes of prosecuting or defending a suit? See *Talbot* v. *McGee et al.,* 4 Mon. 377 ; *Wade* v. *Powell,* 31 Geo. I ; *Buckland* v. *Conway,* 16 Mass. 396 ; *Smith* v. *Bossard,* McCord's Ch. 408.

But this reasoning has no application to any action of the attorney in *pais,* such as agreeing to submit the case to arbitrators by an agreement signed by him without

any special authority from his client.   Such an act on his part is in principle undistinguishable from a similar act, done by him before the institution of the suit.   And I therefore conclude, he has no authority to so act.

The award therefore returned to this Court is not obligatory on the appellants, because their attorney had no authority to sign the agreement to arbitrate.

It would not necessarily follow, that the award is a nullity, as it is possible, that the attorney, who signed it without authority, might be bound to perform the award.   See *Iveson* v. *Covington*, 1 B. & C. 160 (3 Eng. C. L. 50) ; *Bacon* v. *Dubarry*, Salk. 70 ; 1 Caldwell on Arbitration, p. 152.   But on this question I express no opinion.

Syllabus 3.

If the agreement to arbitrate had been entered into by the parties, or by some one duly authorized to make such agreement, I think this Court could have entered up the award of the arbitrators as its decree.   In the case of *Heslip* v. *San Francisco*, 4 Cal. 1, the parties entered into an agreement to submit to arbitration.   The agreement was entered into, not in court but in *pais*, and it provided, that the award should be entered up as the judgment of the court ; but the court of appeals held, that this agreement was a voluntary withdrawal of the case from the jurisdiction of the court, by which the court lost all control over the cause, and it had therefore no authority to enter up judgment on the award, except by consent of parties.   If this be law, it furnishes an additional reason, why an attorney could not enter into an agreement in *pais* to submit a pending case to arbitration; for by so doing he would withdraw the case from the jurisdiction of the court entirely, and his submission would have the same operation, as if he had submitted the matter in controversy to arbitration before suit ; and this, we have seen, he has no authority as counsel to do.

But in a similar case in Mississippi it was held, the award could be entered as the judgment of the court on

common law principles. The Chief Justice dissented from this opinion. See *Wear* v. *Regan*, 1 Miss. 83.

In *Rogers's heirs* v. *Hall*, 6 Humph. 29, it was decided, that by the common law unaided by statute, if after a case is pending in the court of appeals the parties in *pais* by an agreement, whereby the award was to be entered up as the judgment of the court, submit the cause to arbitration, and the arbitrators made an award, such award may be entered up by the court of appeals as its decree.

It is unnecessary for us to determine, whether this decision, or the California case, lays down the law correctly; for whatever doubt there may have been on common law principles of the right of this Court to enter up a judgment, or decree on an award under such circumstances, that doubt is removed by the provision of our statute law. The first section of chapter 108 of the Code of W. Va. provides, that " persons desiring to end any controversy, whether there be a suit pending therefor or not, may submit the same to arbitration, and agree, that the same may be entered of record in *any* court. Upon the proof of such agreement out of court, or by consent of parties given in court in person, or by counsel, it shall be entered in the proceedings of such court; and thereupon a rule shall be made, that the parties shall submit to the award, which shall be made in pursuance of such agreement;" and the third section of this act provides, that " before the return of such award made under such agreement (*whether any previous record of submission, or a rule therefor, has been made, or not*) it should be entered up as the judgment or decree of the court, unless good cause be shown against it at the first term, after the parties have been summoned to show cause against it."

The language of this statute authorizes *any* court to enter up the award as its judgment, though the agreement to submit has been made by the parties, and no

entry of it has been made of record. It applies to all cases pending, whether in this or in any other court; and by its words authorizes this Court to enter up as its decree an award thus made.

It is true, so much of this statute, as provides for the arbitration of suits not pending, and the entering up of the awards by the court, to whom by the agreement of parties the award was to be returned, is necessarily inapplicable to this Court, as to enter up an award in a suit not pending, as the decree of this court, would violate our Constitution by exercising original jurisdiction in a case, not provided for by the Constitution. But with this exception the provisions of chapter 108 of the Code of West Va. are as applicable to this as to any other court.

In framing this statute the Legislature with reference to the persons, who might enter into a binding arbitration, adhered to the common law as herein laid down; as the statute permits the counsel to assent or agree to an arbitration in court, but says nothing of such a right belonging to counsel out of court, either in a suit pending, or before suit brought. The inference to be fairly drawn is, that no such right exists in counsel, except when exercised in court. But neither at common law nor by this statute can an infant bind himself absolutely by an agreement, made out of court, to arbitrate; nor can his counsel so bind him by his consent in court. *Britton* v. *Williams's devisees*, 6 Munf. 453.

In considering this case on its merits especial weight ought to be given to the written evidence, and very little weight to the parol testimony introduced by the appellants. Little or no weight can be given to the evidence of Philip A. Curry, his general character for veracity rendering him unworthy of belief on oath. And no more weight can be attached to the evidence of either Jesse Curry or his wife, even if it is admissible evidence, Their self contradictions, as shown by their answers and depositions, evincing a willingness to swear to anything

to support their case without regard to its truth or falsity.

So regarding the evidence, the facts established satisfactorily are, that Phillip Axtell on May 23, 1866, conveyed to his daughter Rebecca Curry, then the wife of Jesse Curry, a tract of land in Pennsylvania, where they then lived, which by the laws of that State was her sole and separate property. She sold this farm to Zenas Johnson for $5,144.34, and executed a deed to him therefor on September 14, 1871, her husband not being a party to the deed, though he signed it. He, with the knowledge, consent and approbation of his wife, appropriated all the purchase money, which she handed over to him having received it herself.

For this purchase money he neither gave, nor promised to give, his wife any consideration whatever. It was on her part a complete and voluntary gift. He invested three thousand two hundred dollars of it in buying a farm in Missouri of Joseph Cole, who on Oct. 5, 1871, conveyed it, with the knowledge and approval of his wife, to him. Not a word was said by him, or by her, either before or after this sale, about the purchase money, or any part of it, belonging to her, or about her having any claim, legal or equitable, to any part of this farm. He continued to occupy and use this farm as his own, till he exchanged it for a farm of John McGinnis's in West Virginia, which farm was conveyed to him by McGinnis, October 20, 1873.

Pending this negotiation, Jesse Curry's wife set up no claim, that she had any right to the Missouri farm, or that the deed for the West Virginia land should be made to her, and not to her husband. With full knowledge of the transaction she permitted the deed to be made to her husband; and it must be regarded, as made with her assent and approval, she then not claiming to have any sort of interest in this farm, or in the Missouri farm, for which it was exchanged. Her husband, Jesse Curry, continued to occupy and use this farm as his own, till he sold to B. F. Cotrill a part of this farm, fifty and

one-fourth acres; and the residue of it he continued to occupy and use as his own till March 31, 1875, when, with the design of defrauding his creditors and especially McGinnis, he disposed of all his personal property to his sons, and conveyed the residue of this farm to one of his sons, as trustee, for the sole and separate use of his wife, the pretended consideration for such conveyance on the face of the deed being love and affection for his wife and $2,500.00 in cash paid by her. Not one cent of money was paid, when said deed was made, nor shortly before, nor indeed at any time, the pretense now set up in the answers being, that the consideration was the purchase money of the Pennsylvania farm, which had been given to her husband by her years before, and which he had used, as before stated. After the disposition of his personal and real property, Jesse Curry was insolvent; and executions against him were returned " no property found."

Pending the negotiation between McGinnis and Jesse Curry for the exchange of farms, Curry induced McGinnis to borrow for him $250.00, telling him in a letter, that he might secure it by a mortgage on the farm, that McGinnis was about to convey to him. The note for this money was secured by McGinnis signing it as Jesse Curry's security ; but he did not secure it, as he was authorized to do, by a mortgage on the land, he sold Jesse Curry. McGinnis was compelled to pay this $250.00 and interest and the costs of a suit, brought to enforce it out of him. And this suit was brought to set aside the deed made by Jesse Curry to his son, for the sole and separate use of his wife, as fraudulent, and to enforce the payment of this debt out of this land.

The whole transaction discloses a case of gross and outrageous fraud, vainly attempted to be sustained by palpable perjury. The cross-claim, set up by Jesse Curry in his answer, is an after-thought, to excuse his wrongs and defeat McGinnis's just claim. In reference to this cross-claim it is sufficient to say, that it is not only en-

tirely unsustained by evidence, but is proven to be utterly groundless.

In the statement of the case, which precedes this opinion, the evidence has been set out at considerable length; and I shall not review it to show, that it establishes the foregoing facts; except the fact, that the purchase money of the Pennsylvania farm, which belonged to Mrs. Curry, was collected by her, and handed over to her husband, and by him appropriated with her consent and approbation; and that for this purchase money so received he neither gave, nor promised to give, to his wife any consideration whatever; and that this purchase money was a complete voluntary gift on her part to her husband.

If these be facts, and the law authorizes a wife to make such a gift to her husband, it would follow as a matter of course, that such a gift would not be any consideration for a conveyance, made years afterwards for her sole and separate use.

Syllabus 1.

In the case of *Hill* v. *Procter*, 10 W. Va. 60, this court decided, that the twenty-second and twenty-third sections of chapter 130 of the Code of West Virginia made no material change in the common law, as to husband and wife giving evidence for or against each other in a cause, in which they are parties, except in an action or suit between husband and wife. This court in that case further said, it might be, that in some cases brought by husband and wife for certain causes of action, the wife, when she is the meritorious cause of action, may be admitted to give evidence; but this court expressly declined to decide, whether in any such case she could give evidence. The question, whether in such a case, as that presented by this record, either the husband or wife could testify, is an important one. And, as I deem it unimportant in this case to decide it, I shall express no opinion on this question. It is unimportant to decide it, as it is apparent from the contradictions in the sworn answers of Curry and his wife, and the statements in their depositions, and from the contradictions

1878.
Special Term,

McGinnis
v.
Curry.

of important parts, as stated by them, by other disinterested witnesses, as disclosed in the statement of the case, which I have made, that the testimony of Jesse Curry and his wife can not be relied upon, and that the court ought not to attach to their testimony any weight, or if any weight could be given to their evidence in any matter, it could only be in relation to such matters, stated by them, as were rendered probably true by being confirmed by other evidence, or by the circumstances of the case.

The only other witnesses for the appellants on the question, whether the deed, made by Jesse Curry for the use of his wife, was made for a valuable consideration, or whether it was voluntary and fraudulent, were the two sons of Mrs. Rebecca Curry. Philip A. Curry is proved by one of his neighbors to have the general reputation of being "the biggest liar in the settlement," and that he is unworthy of belief on oath. Another near neighbor deposes, that his reputation for veracity is bad, and such that no dependence could be put upon his word, and that he ought not to be believed on oath; and there is in the case no evidence vindicating his character. The other witness was not thus directly assailed; but the circumstances, under which his evidence was given, as well as his statements, compel us to receive it with caution, if not with suspicion. He is a son of Jesse Curry and his wife Rebecca, the trustee to whom the deed, alleged to be fraudulent, was made; and, I presume, one of the sons of Jesse Curry, to whom he disposed of all his personal property about the same time, that he made this deed, alleged to be fraudulent. This deed of this land and disposition of his personal property rendered Jesse Curry insolvent, so that after that executions, issued against him, were returned "no property found." And it is to be presumed, that his son was aware, that after this disposition of his property his father's debts would go unpaid. His statement too, made in his deposition, is not calculated to inspire us with confidence in him; and, before

he gave his deposition, he wrote this letter to Joseph Cole:

"LINDSEY'S MILLS,
WASHINGTON COUNTY, PA.
April 9, 1876.

" *Mr. Cole, Sir:*—I wish to know, whether you and Mrs. Cole did not understand, when we bought that farm of you out there, that it was mother's money we paid for it; that is that the money, that we paid for it, belonged to mother? Please let me know immediately, for it is a case of importance. I want to know by the 24th of this month.

"Please oblige yours,
" RICHMOND L. CURRY."

Joseph Cole did not reply to this letter; but on October 2, 1876, his deposition was taken, in which he does answer these enquiries by saying : " I was never asked to make a deed for this land to Rebecca Curry, wife of Jesse Curry ; there was nothing ever said to me about making a deed to her. Mr. Curry paid the money to me ; and I made the deed to him, just as usual in trades. He said nothing about this money being his wife's, or that the deed was to be made to his wife, nor anything of that kind ; at the time of the sale nor since have I ever understood, that the money, paid me for the land, belonged to his wife, nor that the deed was to be made to her. I got this letter from Richmond L. Curry; but never answered it. I supposed the money was Jesse Curry's."

Some six months after the deposition of Cole was taken, the deposition of Richmond L. Curry was taken ; and it is to be presumed, he knew what Cole had deposed to. When Richmond L. Curry's deposition was taken, he was not cross-examined, it being taken in Pennsylvania. It will be observed that neither of these sons of Rebecca Curry says, that their father collected the purchase money of this Pennsylvania farm, or that their mother handed over to him this purchase money. On

8

the contrary both of them assert, that their mother bought the Missouri farm of Joseph Cole. This statement is positively contradicted by Cole, who is entirely disinterested. And he could have no objection to making the deed to their mother, if told, that it was bought with her money, and if he had been asked to make the deed to her. The reasons assigned by Philip A. Curry, why the deed was not made to his mother, are very unsatisfactory, and indeed almost ridiculous.

The receipt on the back of the deed for the Pennsylvania farm shows, that Mrs. Rebecca Curry received herself of Zenas Johnson on September 14, 1871, the whole purchase money of this farm. This was only seventeen days before, Jesse Curry bought of Joseph Cole, and paid for, the Missouri farm.

Philip Curry in his deposition says : "That the deferred payments, on the sale of his mother's farm in Pennsylvania, were secured by judgment notes drawn in her favor. These payments, as they fell due, were collected by Axtell Throckmorton ; and the money was sent by him to Mrs. Curry in Missouri ; and it was with this money, she purchased the farm from Cole." This can hardly be ; as it is highly improbable, that any deferred payments could have fallen due, been collected and sent to Missouri in seventeen days from the time, the Pennsylvania land was sold. As the purchase money of the Cole farm was paid by Joseph Cole acting for himself, if any of the purchase money of the Pennsylvania farm was used for that purpose, it must have been a portion of the cash paid to Mrs. Curry seventeen days before. Though the evidence does not show, that Jesse Curry got any of the money, he paid Cole, from his wife ; yet as it was paid so soon after she received this money, it is very probable that he did. And if he did, he must have received it from her promptly after her receipt of it from Zenas Johnson.

Assuming that Jesse Curry got from his wife a portion of this money, the next enquiry is. Did he receive

as her agent to invest for her in the farm in Missouri? There is no evidence, that he so received it; on the contrary the conduct of both Jesse Curry and his wife show clearly, that he did not so receive it. In less than three weeks afterwads he invested this money in the purchase of a farm in Missouri. He makes the investment for himself, and not as her agent; he takes the deed to himself; and neither he nor she say one word to the seller to indicate that he was acting as her agent. He continues to reside in Missouri on this farm for two years, he using the farm as his own during all this time, and Mrs. Curry setting up no pretense that she had any interest in it. He then exchanges it with McGinnis for a farm in West Virginia. This exchange was made by correspondence between Jesse Curry and McGinnis; and the letters on behalf of Jesse Curry are written by his son, Philip A. Curry. They are all written in his name; his mother is in no manner mentioned, or alluded to in them. It is true, Philip A. Curry testifies, that his mother made this trade with McGinnis; but his own letter shows, that this is false. His father made the deed to McGinnis; and in return McGinnis executed a deed to him. It is true, Phillip A. Curry does say, that it was understood and agreed, that McGinnis should make this deed to his mother, and that the reason it was not so made was, that their attorney, Charles Merrick, told them, that a married woman could not hold land in West Virginia. This on its face is a very improbable statement ; and the evidence of Mr. Merrick is not taken to corroborate it.

McGinnis positively denies this statement. He says in his deposition, " there was nothing said in the trade about making the deed of the land, I traded to him, to his wife, Rebecca Curry. I know nothing about the title being put in her. There was no agreement of any kind to that effect between Curry and me." This statement of McGinnis we must regard as unquestionably true. We can see no reason, why the deed should have been drawn to Jesse Curry, if the understanding had

been, that it should be made to his wife. McGinnis could have had no possible objection to making it to her, had he then been asked to do so. It is true, Richmond L. Curry in his deposition says, that "McGinnis had promised to make the deed to her." But he shows by his own statement, that it was utterly impossible for him to have known of such a promise being made, if any such had in fact been made. The parties had never had any personal interview, till within about a month of the time McGinnis made his deed to Jesse Curry.

Prior to that Jesse Curry and his wife were living in Missouri, while McGinnis was living in West Virginia; and if before that time any such promise was made by McGinnis, it must have been by letter. No such letter is produced, nor is it pretended, that any such promise by letter was ever made. But when Jesse Curry and his wife came to West Virginia in the fall of 1871, their son, Richmond L. Curry, according to his own deposition, remained in Missouri, and did not come to West Virginia, till some five months after McGinnis had executed his deed to Jesse Curry.

If McGinnis had made a promise to make this deed to Mrs. Curry, as her son, Richmond, says he did, it must have been made in West Virginia, while Richmond L. Curry was in Missouri. His statement therefore, that McGinnis made such a promise to his mother, can have no effect, except to weaken our confidence in other statements made by him. In making such a statement he was evidently saying as true, that which he did not know. He says he did not know, that the deed had been made by McGinnis to his father till April, 1874. If he saw or knew anything of the correspondence between McGinnis and his father, he had no reason to suppose, that the deed would be made otherwise than to his father.

He further says, that the " McGinnis farm was purchased with his mother's property, in which his father had no interest." It was exchanged for the Missouri

farm; and if he means to assert, that his father had no interest in it, then he is contradicted by Joseph Cole, of whom it was bought, and who says, that it was his mother who had no interest in it.

After the deed was made by McGinnis to Jesse Curry, he continued to use this farm as his own, Mrs. Curry setting up no claim to it; and after a while Jesse Curry sells fifty and one-fourth acres of it to Cottrill, and then continued to use the balance of the farm, not sold, as his own till March 31, 1875, when he conveyed it to his son, Richmond L. Curry, in trust for the sole and separate use of his wife, Rebecca.

This is the first time, that she seems to have set up any claim to this farm. The circumstances, under which she set up this claim, are very suspicious. Her husband had become involved; and, about the same time he made this deed for the separate use of his wife, he also disposed of, to his sons, all his personal property; and then executions issued against him are returned "no property found."

The deed too on its face is not consistent with the pretension that this farm was purchased with her money, and always had been regarded as belonging to her. It recites, "that Jesse Curry for and in consideration of the love and affection, he has for his wife, Rebecca Curry, and for the further consideration of the sum of $2,500.00, to him in hand paid by said Rebecca Curry, the receipt whereof was thereby acknowledged, granted," &c. This does not look, as if the purpose of this deed was to transfer the legal title to his son, as trustee for his wife, of land, which already belonged to her in equity, and the legal title of which he really held as her trustee only. It purports to be a sale of land, which belonged to him, for a consideration, which he then received, but which was not a full consideration, but which he was willing to accept as the price of this land, because of his love and affection to his wife. In point

of fact he did not receive one cent of consideration for this conveyance.

It seems to me, these facts establish clearly, that any moneys received by Jesse Curry from his wife, when she sold her land in Pennsylvania to Johnson, were not received by him as her agent, to be by him invested in the land in Missouri for her use; and that the statement made by Richmond L. Curry, "that he knew this farm was purchased with his mother's money," can not be treated as correct, any more than can his statement, "that she bought the farm from Joseph Cole," or the statement, "that McGinnis had promised to make the deed to her."

It would have been much more satisfactory, if this witness had stated, how he knew, that the Missouri farm was purchased with his mother's money. It may be, that according to his view he could properly use such language, though the money, with which this farm was bought, had been made a gift to his father by his mother. But, whatever may be his views, the evidence and all the circumstances indicate to my mind clearly, that this Missouri farm was bought by Jesse Curry for himself, and not for his wife; that it was so bought with her knowledge and approval; and if bought with money she had let her husband have, that this money was intended by her as a gift to her husband, and, when this purchase of the Missouri land was made, could not be regarded as her money.

I conclude, that this money was given by Mrs. Curry to her husband, as we have seen; that it was not in his hands to be used by him in making a purchase for her; and it being his money, it must have been a gift to him, unless there was some contract expressed, or implied, that he was to return it to her at a future day. It is not pretended, that there was such an express contract; and all the circumstances, I have stated, repel the conclusion, that there could have been any such contract implied.

The position of Mrs. Curry is not, that she loaned this

money to her husband, or that there was any express, or

implied, contract, that it should be returned to her at a future time ; but that she never did lend it to him, and that it never did belong to him, but was only in his hands as her agent, and that it was his duty, as it was his expressed desire, to invest it for her use and in her name, first in the Missouri land and afterwards in the land in West Virginia, and that, by want of proper care and through the fault of Cole and his wife, and McGinnis, the investments were not made for her use and in her name, as they ought to have been, and as was understood between her and her husband.

This pretense on her part being overthrown by the positive testimony of both Cole and McGinnis, as well as by the conduct of Jesse Curry and his wife for a period of three and a half years, she cannot now fall back on a pretense, that Jesse Curry was indebted to her for this money, she had loaned him. Her own answer, as well as the evidence of her sons, shows, that she never loaned her husband any money.

If in the purchase of these farms in Missouri and West Virginia Jesse Curry was not her agent, then she never had any claim to either of them according to the case as stated by them ; and the attempt to convey it to her for her sole and separate use must be regarded as fraudulent, null and void. To this conclusion we must come, if it is admitted, that a wife may make a gift to her husband of money belonging to her as her sole and separate estate. That she may make such a gift is the settled law both of West Virginia and Pennsylvania.

If the depositions of Jesse Curry and Rebecca Curry had been admissible as evidence on the question, whether this deed was valid, the conclusion reached would have been the same ; as the inconsistencies in these depositions and their contradictions of statements in their answers, some of which have been pointed out, would have rendered their evidence of very little value. There is scarcely a statement in Philip A. Curry's deposition,

which is not contradicted, either by the evidence of reliable witnesses, or by the written testimony in the cause. An instance of this, not heretofore · pointed out, is his statement, " that his father and mother executed a deed for the Missouri farm to McGinnis, before they. left Missouri." The deed on its face shows, that it was not executed, till they came to West Virginia to live.

I shall now review the decisions, especially in Pennsylvania, Virginia and West Virginia, and show, that the conclusions, I have reached, are sustained by the authorities.

It is well settled, that where upon a purchase of property the conveyance of the legal title is taken in the name of one person, while the consideration is given or paid by another, the parties being strangers to each other, a resulting trust immediately arises from the transaction ; and the person named in the conveyance will be a trustee for the party, from whom the consideration proceeds. The presumption in such a case being, that the conveyance in the name of another was made as a matter of convenience and arrangement between the parties for collateral purposes. See *Bank of the United States v. Carrington*, 7 Leigh 566 ; *Nixons' Appeal*, 63 Penn. St. 279.

Syllabus 1, III.   It is equally well settled, that such a resulting trust will not arise, where the party, who advanced the purchase money, bears certain close relations to the party, in whose name the deed is taken. If a father advances the purchase money, for instance, and the deed is taken in the name of a wife or child. *Shaw et al v. Read*, 47 Penn. St. 96. So too, if a grandparent advances the purchase money, and the deed be taken in the name of a grandchild, even though the father be not dead, the presumption would be, that it was intended as a gift, and no remitting trust would arise. This is a legitimate inference from the English cases. See *Ebrun v. Duncer*, 2 Ch. Ca. 26 ; *Lloyd v. Read*, 1 Wms. 607 ; *Kilpin v. Kilpin*, Moo. & R. 520. In these and other instances,

in which the law presumes, that the person advancing the money intended it as a gift to the person in whose name the deed is made, this presumption is one of fact and not of law, and may be rebutted by evidence or circumstances.

The presumption, that the advancement of the purchase money was intended as a gift, is not confined to the case, where the person making the advancement was under legal obligations to support the other party. A grandparent is under no such obligation to support a grandchild, especially when its father is living; and yet the more recent English cases, above cited, assume, that a gift would be presumed in such a case, where a deed is taken in the name of the grandchild, and the purchase money advanced by the grandparent.

A wife may dispose of her separate personal estate, or the proceeds of the sale of her separate real estate, in any manner she pleases. She may apply it to the payment of her husband's debts, or, if she chooses, she may give it to her husband. *Bennett et ux.* v. *Harper's ex'or*, 25 Gratt. 486; and *Patton, &c.* v. *Merchant's Bank of Charleston*, 12 W. Va. 587. It would therefore follow, that if a purchase of real estate is made by a husband in his own name with money, which his wife had either loaned or given to him, their could in such a case be no remitting trust to the wife, simply because the purchase would not be made with her money, but with his. This was expressly so decided in *Gibson* v. *Foote*, 40 Miss. 788, though in that State there is an express statutory provision: "If the husband shall purchase property in his own name with the money of the wife, he shall hold the same only as trustee for her use." The court says: "The object of this statute was to secure to the wife property purchased by the husband with her money, in his hands, without her consent. It has reference to cases, when such money continues to be the property of the wife; but not to cases, when he is allowed with her consent to have the use of it as his own property." The

soundness of these views of the Mississippi court cannot be questioned.

The real difficulty in most cases is to determine on the evidence, whether the wife has made a gift or loan to her husband, or whether he has held her money only as her agent. When the proof is satisfactory on these questions, there is but little difficulty in applying the law; but if there be no proof in reference to the capacity, in which the husband holds his wife's money, whether as donee, borrower, or agent; and land is purchased with the money; or where the evidence is vague and unsatisfactory, what are the presumptions of law?

In the particular case before us, especial weight should be given to the decisions of the Courts of Pennsylvania, as it was there the wife sold her land, which was her separate estate, and it was there she secured the purchase money, and probably there she handed it over to her husband. And the law of that State is the law by which we should determine, in what capacity he secured this money, whether as agent for his wife, as borrower, or as donee. In the case of the *appeal of Ann McClinsey, administratrix,* 14 Serg. & R. 65; Tilghman, Chief Justice, thus states the law: "It is a general principle, when a wife permits her husband to receive the profits of her separate estate, and particularly when they live together, and the expenses of housekeeping are paid by him, the presumption is, that it was the intention of the wife to make a gift of the profits to the husband." This decision was rendered in 1826.

In 1838, in *Towers* v. *Haynes*, 3 Whart. 48, Judge Kennedy, in the court below, charged the jury: "If the husband received any of the rents of the separate property of his wife, or the interest on her separate moneys loaned out, by and with her consent, while they lived together in peace and harmony, and used them without any complaint or objection being made by her for years, the presumption would be, that such rents and interest so received were a gift from her to him; and his estate

*Margin:* 1878 Special Term. McGinnis v. Curry.

would not be accountable. But if he had collected or received the principal or any portion of it, though with her knowledge, no presumption of its being a gift would arise from that circumstance. It ought to appear distinctly, that she had assented to his receiving the principal as a gift, otherwise he would be liable for it."

1878
Special Term.

McGinnis
v.
Curry.

The Court of Appeals approved expressly so much of this charge, as refers to the rents and interest, and did not disapprove of so much of it, as refers to the principal, though they did not speak of it particularly. The principle laid down by the court in the case of the *appeal of Ann McGlinsey,* 14 Serg. & R. 65, approved by the Supreme Court of Pennsylvania, in *Nagles* v. *Ingersoll,* 7 Penn. St. 204, decided in 1847.

In 1848 an act was passed by the Legislature of Pennsylvania, declaring " that all property not personal and mixed, which shall accrue to any married woman by coverture, by will, descent, deed of conveyance or otherwise, shall be owned and enjoyed by such married woman as her own separate property."

After the passage of this act the Supreme Court of Pennsylvania decided, that if money, the proceeds of the wife's land, in which she had a separate estate by the law above quoted, was received by the husband, the mere act of receiving it did not make it the property of the husband ; but if it was appropriated to fitting up a house of his as a home, at her request and for her comfort and that of the family, she could not recover it, unless there was an express promise made at the time to repay the same. But a promise to repay it, made subsequently, would be invalid, there being no consideration to support it. To hold otherwise, the court says, would lead to innumerable and gross frauds on creditors and heirs. See *Johnston* v. *Johnston's adm'r,* 31 Penn. St. 454.

Syllabus 1, 11.

This cause is, in its essential features, similar to the one now before us. The purchase of the Missouri farm was made with Mrs. Curry's approval for the comfort of

herself and the family; and a subsequent promise to pay her therefor would have been void, being sustained by no consideration.

In the case of *Graybill* v. *Mayer et al.*, 45 Penn. St. 530, it was decided, that the mere possession by the husband of the wife's money, accruing to her under the act of 1848, is no evidence of his title thereto, as it is easy for him to obtain such possession; and when he obtains it with her consent, it can be at most but slight evidence of a gift, and is repelled if notes are taken for the money at the time, or soon after it was received. The court held further, that in a controversy with creditors the husband's declaration in favor of his wife 'was not proper evidence; but they declined to reverse the judgment, because declarations of the husband had been given in · evidence showing, that he had borrowed this money, as these declarations were made, when he was entirely out of debt, and long before any controversy with his creditors had arisen. In this case it was contended, that if a wife permits her husband to use her moneys, even on a lease, and thereby gets a false credit, that she ought not to be permitted to claim a judgment confessed on such lease, and thereby withdraw all the husband's property from his creditors.

The court in deciding the case admit, "that the act. of April 11, 1848, gave to debtors greatly increased facilities for protecting their property against the just claims of creditors, and opened a wide door for the perpetration of frauds;" but against such frauds, the court say, "they have endeavored to erect every possible safeguard, con- ·sistent with our duty to give full effect to the action of the Legislature."

I do not doubt, that in Pennsylvania it would be held, that if a wife invests the proceeds of her separate estate, in her husband's name, in a home for herself and the family, this investment would be a gift to him, and no resulting trust could arise to her, nor could he subsequently, when seriously embarrassed, convey property

to her in consideration of this gift, formerly made to him. And such in substance is the case before us. Such a transaction should be held fraudulent in this State, where the earnest disposition of the courts, to protect creditors against the fraudulent contrivances of debtors, has been shown in several decisions of this Court.

There is nothing in the assignment of error by the appellants' counsel, that this land ought not to be sold, because it no where appears, that this is all the land owned by Jesse Curry. This is a mistake. The bill says, "that the plaintiff had learned that said Curry had conveyed all his property out of his hands." The answers do not assert, that Jesse Curry had any other real estate, which he had not conveyed away; and the court did not err in assuming this to be a fact.

The second assignment of error, that when this debt to McGinnis was contracted, Curry owned no real estate, would be groundless, even if this were a fact; but it is not, as this debt to McGinnis did not arise, when the $250.00 was borrowed, but when it was paid by McGinnis.

There is no error in the decree of the court, except some formal omissions.

The decree must be corrected by supplying these omissions, and then affirmed; and the appellee, John McGinnis, must recover of the appellants his costs, expended in this Court, and damages according to law.

These corrections in the decree are, that instead of decreeing a sale of the land, in the bill and proceedings mentioned, the decree should be after the sale of the land, in the bill and proceedings mentioned as conveyed to Richmond L. Curry, trustee, or so much thereof, as may be necessary to pay the debt due to John McGinnis, and interest, and the costs of the suit including the costs of the sale. And instead of requiring simply, that before receiving any money under the decree, the commissioner shall give bond in the penalty of seven hundred dollars, conditioned according to law, it should be, that he should

be required to give bond with good security, to be approved by the clerk of the circuit court of Ritchie, conditioned according to law.

The other Judges concurred.

DECREE AFFIRMED.